IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01385-LTB-CBS

ERNIE L. CALBART,
        Plaintiff,
v.

THE DENVER SHERIFF DEPARTMENT,
DEPUTY SHERIFF WISE, and
DEPUTY SHERIFF BURKE,[1]
        Defendants.

---

**RECOMMENDATION REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Magistrate Judge Shaffer

THIS MATTER comes before the court on Defendants Denver Sheriff Department and

Deputy Sheriff Wise's Motion for Summary Judgment (doc. #137), filed on July 5, 2011.  The

*pro se* Plaintiff, Ernie Calbart, filed his Response to Defendants' Motion for Summary Judgment

(doc. #147) and attached exhibits on August 19, 2011.  Defendants filed a Reply to Response to

Motion for Summary Judgment (doc. #158) on September 20, 2011.

**BACKGROUND**

Plaintiff Calbart filed his Third Amended Complaint (doc. #23), the operative pleading in

---

[1]Rule 4(m) of the Federal Rules of Civil Procedure provides that the court shall dismiss
an action without prejudice as to any defendant who has not been served within 120 days of the
filing of the action.  More than a year has passed since the filing of this civil action and the
record before the court indicates that Defendant Burke still has not been served with a summons
and complaint in this action and has not otherwise appeared in this case.

this case, on September 23, 2010.[2]  The Third Amended Complaint invokes the court's

jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, and alleges one claim for relief

for violation of the Americans with Disabilities Act ("ADA").  Mr. Calbart has sued the Denver

Sheriff Department, as well as Defendant Deputy Sheriff Wise in his official capacity only.  *See*

Order to Dismiss in Part and to Draw Case to a District Judge and a Magistrate Judge" (doc. #

25), at 3.  Mr. Calbart's claim against Defendant Wise in his official capacity is effectively a

claim against the Denver Sheriff Department.  *Id.*  Plaintiff's Third Amended Complaint also has

been broadly construed to assert a claim against Defendant Wise in his individual capacity for

violating Mr. Calbart's rights under the Eighth or Fourteenth Amendments, based upon that

Defendant's alleged deliberate indifference to Plaintiff's health or safety.  *Id.* at 3-4.

Mr. Calbart avers that on April 28, 2010, as a pretrial detainee in the Denver County Jail,

he was suffering from "cognizable disabilities" associated with a meniscus tear and degenerative

arthritis in his right knee and "left knee severe degenerative arthritis."   According to Mr. Calbart,

Defendant Wise assigned him to a second floor cell in Building 9B.  Plaintiff alleges that he

informed Defendant Wise of his medical condition and explained that he could not climb two

flights of stairs.  "Plaintiff asked the Denver Sheriff Wise . . . to make a reasonable

accommodation [he] refused and for that on 5-1-2010 Plaintiff fell down the stairs and now

suffers injuries."  *See* Third Amended Complaint, at 4.  Mr. Calbart claims that as a result of his

fall on May 1, 2010, he is now forced to use a wheelchair.  The Third Amended Complaint

---

[2]The action commenced on June 15, 2010 with the filing of Mr. Calbart's original
Complaint.  Plaintiff filed an incomplete amended complaint on June 21, 2010, and then filed a
second amended complaint on August 17, 2010.  With an Order dated September 15, 2010, Mr.
Calbart was permitted to file a third and final amended complaint on or before October 15, 2010.

requests "2.5 million dollars"in damages, and injunctive relief in the form "that all Defendant

[sic] be subject to disciplinary action" and "that Plaintiff be moved to a proper medical facility,

that an orthopaedic specialist examine and perform the necessary knee replacement specialist has

suggested/required." *Id.* at 9.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c)(2). *See*

*also Devery Implement Company v. J.I. Case Company,* 944 F.2d 724, 726 (10th Cir.1991);

*Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir.1991). To meet the burden of

persuasion required to support summary judgment under Rule 56, the movant must "point to

those portions of the record that demonstrate an absence of a genuine issue of material fact, given

the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024

(10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A fact is

"material" if under the substantive law it could have an effect on the outcome of the lawsuit.

*Equal Employment Opportunity Comm'n v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184,

1190 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

While the moving party bears the initial burden of showing that there is an absence of any

issues of material fact, *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991), the movant

need not negate the non-movant's claim. *See John Hancock Mut. Life Ins. Co. v. Weisman*, 27

F.3d 500, 503 (10th Cir. 1994); *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.*, 22 F.3d

1527, 1529 (10th Cir. 1994). Once the moving party points to an absence of evidence to support

3

the non-moving party's claim, the non-moving party may not rest upon his pleadings, but must come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's case. *See* Fed. R. Civ. P. 56(e). *See also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

The court must construe the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1996). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52.

To defeat a properly supported motion for summary judgment, there must be evidence upon which the jury could reasonably find for the plaintiff. Conclusory allegations will not create a genuine issue of material fact necessitating trial. *Dobson v. City and County of Denver*, 81 F. Supp. 2d 1080, 1083 (D. Colo. 1999). Evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment. *Ayon v. Gourley*, 47 F. Supp. 2d 1246, 1252 (D. Colo. 1998). The demonstration of "some metaphysical doubt as to the material facts" is not sufficient to establish a genuine issue of material fact. *Foreman v. Richmond Police Department*, 104 F.3d 950, 957 (7th Cir. 1997). "The very purpose of a summary judgment action is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

As Mr. Calbart submitted his Third Amended Complaint under penalty of perjury, the court may treat that pleading as an affidavit. *Green v. Branson*, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997). *See also Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("Although a

nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e).").  "Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein."  *Conaway v. Smith*, 853 F.2d at 792.

Where the court treats a verified complaint as an affidavit, whether a party's affidavit in opposition to summary judgment is "sufficient to create a genuine issue of material fact must be evaluated in light of the principle that 'conclusory allegations without specific supporting facts have no probative value.'"  *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).  *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting Fed. R. civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading")).  The court must determine whether Mr. Calbart has come forward with specific facts to overcome Defendants' Motion for Summary Judgment.

A.    *The Factual Record*

A careful review of Defendants' Motion for Summary Judgment and Mr. Calbart's Response, as well as the exhibits proffered by both sides, reveals the following undisputed facts.[3]

---

[3]Contrary to the requirements of Fed. R. Civ. P. 56(e), Mr. Calbart's Response does not address or present evidence to refute the specific "undisputed facts" set forth in Defendants' Motion for Summary Judgment.  Under the circumstances, Rule 56(e) permits the court to either "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the

The Denver Sheriff Department operates the Denver County Jail.  Building 4 of the County Jail is a medical unit that houses inmates with physical conditions requiring medical observation, and inmates with severe mental health issues, subject to the approval of the medical staff.  Building 6 of the County Jail houses "special management" inmates, including prisoners with a physical or mental condition whose safety is at greater risk if they are housed with the general population of jail inmates, and also inmates with behavior problems who need to be held in a single cell.  Building 9 of the County Jail houses general population inmates based upon their security risk and pending criminal charges.  *See* Affidavit of Sergeant Sonya Gillespie (hereinafter the "Gillespie Affidavit") at ¶¶ 6-9, attached as Exhibit A (doc. #137-1) to Defendants' Motion for Summary Judgment.

Inmates housed in cells in the medical unit of Building 4 and inmates housed in Building 6 generally remain in their cells for 23 hours of the day.  Building 9 has a dormitory on each floor with bunks, instead of individual jail cells.  Inmates in Building 9 are allowed to circulate on the same floor throughout the day.  *See* Affidavit of Deputy Sheriff Stevie Wise (hereinafter the "Wise Affidavit"), at ¶ 8, attached as Exhibit B (doc. #137-2) to Defendants' Motion for Summary Judgment.

Mr. Calbart was arrested on September 4, 2009, on a charge of aggravated robbery and booked into the Pre-Arraignment Detention Facility ("PADF") where he remained until his transfer to the County Jail on September 8, 2009.[4]  *See* Gillespie Affidavit, at ¶¶ 10 and 12.

---

motion and supporting materials - including the facts considered undisputed - show the movant is entitled to it."

[4]The Sheriff Department operated the Pre-Arraignment Detention Facility until its closure in April 2010.  The Denver Justice Center was opened in May 2010 and is used for the custody of

While at the PADF, Plaintiff was seen by Nurse Lowell Pippinger for a routine initial medical assessment. According to Nurse Pippinger's notes, Mr. Calbart did not identify any injuries, surgeries or prosthesis, but reported having chronic back pain that was being treated at the Veterans Administration Hospital with prescribed medications. *See* Exhibit A-5 (doc. #137-1, page 18 of 74), attached to the Gillespie Affidavit. On September 5, 2009, Mr. Calbart was allowed to use a crutch at PADF and was housed alone for this reason, because the crutch could be used by another inmate or by Mr. Calbart to cause injury. *See* Gillespie Affidavit, at ¶ 11.

Following his transfer to the County Jail on September 8, 2009, Mr. Calbart was housed in the Building 4 medical unit because he used a crutch. *See* Gillespie Affidavit, at ¶ 14. On September 17, 2009, Mr. Calbart submitted an Inmate Request for Medical Assistance form in which Plaintiff stated that he no longer wanted to use his crutches because he wanted "to go to general population." *See* Exhibit A-5 (doc. #137-1, page 20 of 74), attached to the Gillespie Affidavit. Plaintiff was approved for general population housing on September 17, 2009. *See* Exhibit A-5 (doc. #137-1, page 21 of 74), attached to the Gillespie Affidavit.

From September 17, 2009, to October 13, 2009, Mr. Calbart was housed with general population prisoners in Building 9. *See* Gillespie Affidavit, at ¶ 15. On September 17, 2009, Mr. Calbart submitted another Inmate Request for Medical Assistance stating that he wanted the cane and knee braces that he had when he was booked into the Pre-Arraignment Detention Facility. *See* Exhibit A-5 (doc. #137-1, page 22 of 74), attached to the Gillespie Affidavit. Mr. Calbart submitted an Inmate Request for Medical Assistance on September 24, 2009, asking if the doctor

---

pretrial detainees. Mr. Calbart was incarcerated at the County Jail until May 2, 2010 when he was moved to the Denver Justice Center. *See* Gillespie Affidavit, at ¶ 13.

had approved his request for a knee brace.  *See* Exhibit A-5 (doc. #137-1, page 23 of 74),

attached to the Gillespie Affidavit.  On September 24, 2009, Mr. Calbart was prescribed two Ace

bandage wraps for one month.  *See* Exhibit A-5 (doc. #137-1, page 24 of 74), attached to the

Gillespie Affidavit.

      Plaintiff continued to submit Inmate Request for Medical Assistance forms.  On October

3, 2009, Mr. Calbart stated that he was having a hard time walking because of bad pain in his

feet.  *See* Exhibit A-5 (doc. #137-1, page 25 of 74), attached to the Gillespie Affidavit.  Mr.

Calbart reported on October 6, 2009 that he was experiencing severe pain in both knees and

asked why his 9:00 am medication was discontinued.  *See* Exhibit A-5 (doc. #137-1, page 26 of

74), attached to the Gillespie Affidavit.  Plaintiff submitted another Inmate Request for Medical

Assistance on  October 7, 2009, indicating that he needed to see a doctor about resuming use of

his cane because he was having problems walking without it.  In the same form, Mr. Calbart said

that he wanted to return to Building 4.  *See* Exhibit A-5 (doc. #137-1, page 27 of 74), attached to

the Gillespie Affidavit.  On October 13, 2009, Dr. Peter Crum reviewed Mr. Calbart's medical

chart and documented that Mr. Calbart could return to Building 4 so that he could use his cane.

*See* Exhibit A-5 (doc. #137-1, page 26 of 74), attached to the Gillespie Affidavit.  Mr. Calbart

was housed in the medical unit in Building 4 from October 13, 2009, until October 15, 2009.  *See*

Gillespie Affidavit, at ¶ 16.

      On October 13, 2009, Mr. Calbart submitted an Inmate Request for Medical Assistance

form stating that he did not want his cane and wanted to return to the general population area of

the Jail.  *See* Exhibit A-5 (doc. #137-1, page 28 of 74), attached to the Gillespie Affidavit.  On

October 16, 2009, Nurse Woudwyk recommended that Mr. Calbart return to general population.

*See* Exhibit A-5 (doc. # 37-1, page 29 of 74), attached to the Gillespie Affidavit.  From October 16, 2009, to October 27, 2009, Mr. Calbart was housed with general population in Building 9. *See* Gillespie Affidavit, at ¶ 17.

On October 22, 2009, Mr. Calbart submitted an Inmate Request for Medical Assistance stating that he needed a cane because he was in a lot of pain and needed to be housed in the Building 4 medical unit.  *See* Exhibit A-5 (doc. #137-1, page 30 of 74), attached to the Gillespie Affidavit.  From October 27, 2009 to November 6, 2009, Mr. Calbart was housed in the medical unit in Building 4 based on his knee condition and his need to use a cane to assist with walking and weight bearing.  *See* Gillespie Affidavit, at ¶ 18.

Mr. Calbart submitted a new Inmate Request for Medical Assistance form on November 2, 2009, in which he said he did not need a cane and insisted that he never asked for a cane.  Mr. Calbart reported that his knees were doing "ok" and that his medication was helping.  Mr. Calbart indicated that he was "sorry for the troubles" but wanted to "go back [to] 9A."  *See* Exhibit A-5 (doc. #137-1, page 33 of 74), attached to the Gillespie Affidavit.  Mr. Calbart made the same points in two separate Inmate Request for Medical Assistance forms dated November 3, 2009.  *See* Exhibit A-5 (doc. #137-1, page 33-34 of 74), attached to the Gillespie Affidavit.

On November 6, 2009, Dr. Crum cleared Mr. Calbart for assignment to the general population area.  *See* Exhibit A-5 (doc. #137-1, page 31-32 of 74), attached to the Gillespie Affidavit.   From November 6, 2009, to January 11, 2010, Mr. Calbart was housed with general population in Building 9.  *See* Gillespie Affidavit, at ¶ 19.  On January 9, 2010, Mr. Calbart submitted an Inmate Request for Medical Assistance stating that he needed his cane because "I can't bear weight on my legs in bad pain."  Once again, on January 12, 2010, Mr. Calbart was

provided with a cane to assist with walking.  *See* Exhibit A-5 (doc. #137-1, page 36 of 74),

attached to the Gillespie Affidavit.  Also after January 11, 2010, Mr. Calbart was housed in the

Building 4 medical unit.  *See* Gillespie Affidavit, at ¶ 20.

Mr. Calbart submitted an Inmate Request for Medical Assistance on January 13, 2010,

indicating that using one cane would not suffice because both knees were giving him pain.

Plaintiff was seen by a nurse on January 14, 2010, who noted that Mr. Calbart had requested

crutches or a walker.  Mr. Calbart was scheduled to see Dr. O'Brien at her next weekly visit.

*See* Exhibit A-5 (doc. #137-1, page 37 of 74), attached to the Gillespie Affidavit.  On January 14,

2010, Mr. Calbart submitted an Inmate Request for Medical Assistance stating that he "can't

walk" and is unable to stand because both knees and legs, as well as his back, were in severe

pain.  *See* Exhibit A-5 (doc. #137-1, page 38 of 74), attached to the Gillespie Affidavit. Nursing

notes prepared on January 14, 2010 indicate that "[Mr. Calbart] ambulated to door of cell without

cane to take medications.  No deficits in ambulation noted.  No complaint of pain."  A nursing

note for January 15, 2010 reported that "[i]nmate ambulated from bed to sink to door for

medications unassisted and without use of cane….He appears in no acute distress and is standing

at cell door."  *Id*.

On January 17, 2010, Mr. Calbart submitted an Inmate Request for Medical Assistance

which reported that he could not stand or bear weight on his legs.  The nursing note for January

18, 2010 indicated that Mr. Calbart ambulated by himself with a cane, and that he had been

scheduled to see Dr. O'Brien at the next weekly visit.  *See* Exhibit A-5 (doc. #137-1, page 39 of

74), attached to the Gillespie Affidavit.  On January 19, 2010, Mr. Calbart was seen by Dr. Kelly

O'Brien, who concluded that Plaintiff should receive two crutches and his cane.  Dr. O'Brien

also noted that Mr. Calbart's MRI showed bilateral arthritic knees. *See* Exhibit A-5 (doc. #137-1, page 40 of 74), attached to the Gillespie Affidavit. On January 22, 2010, Mr. Calbart submitted an Inmate Request for Medical Assistance stating that he wanted to be moved to Building 6 with his crutches. According to the nursing note for January 22, 2010, Mr. Calbart was told that he could not be housed outside of Building 4 with his crutches. *See* Exhibit A-5 (doc. #137-1, page 41 of 74), attached to the Gillespie Affidavit.

Medical records dated January 23, 2010 report that Mr. Calbart was observed standing on one leg and kicking his cell door with the other leg. The same records indicate that Plaintiff was able to walk around his cell without crutches. The latter behavior apparently had been observed on three different occasions. *See* Exhibit A-5 (doc. #137-1, pages 41-42 of 74), attached to the Gillespie Affidavit. On January 24, 2010, Mr. Calbart reportedly was kicking the door of his cell with both feet and urinating on the floor and under the door. Plaintiff's crutches were removed by a deputy sheriff. *See* Exhibit A-5 (doc. #137-1, page 43 of 74), attached to the Gillespie Affidavit.

On January 26, 2010, Mr. Calbart submitted two Inmate Request for Medical Assistance forms. The first reported, in part, that Mr. Calbart could not walk and "may need a wheelchair." In his second form, Mr. Calbart indicated that he wanted to return to general population and was willing to give up his crutches. *See* Exhibit A-5 (doc. #137-1, pages 44-45 of 74), attached to the Gillespie Affidavit. On January 27, 2010, Mr. Calbart submitted seven Inmate Request for Medical Assistance forms. Four of Plaintiff's Requests indicated that he wanted to give up his crutches and return to the general population. In a separate Inmate Request for Medical Assistance submitted on the same day, Mr. Calbart reported that his knees were doing better and

11

that he wanted to be "cleared" to return to Building 9A "ASAP." Yet on the very same day, Mr. Calbart submitted two Inmate Request for Medical Assistance forms which he reported that his knees were aching badly and that he might need a wheelchair. *See* Exhibit A-5 (doc. #137-1, pages 46-52 of 74), attached to the Gillespie Affidavit.

On January 30, 2010, Plaintiff was seen by Dr. O'Brien who noted that Mr. Calbart wished to be cleared for general population. In the same notes, Dr. O'Brien reported that Plaintiff was walking significantly better without crutches than with them. Dr. O'Brien ordered that the crutches could be discontinued and that Plaintiff could be transferred to general population. *See* Exhibit A-5 (doc. #137-1, page 53 of 74), attached to the Gillespie Affidavit. On the same day, Dr. O'Brien completed a "Recommendation for Classification" form stating that Mr. Calbart was cleared for the general population without his crutches, and that she recommended a bottom bunk. *See* Exhibit A-5 (doc. #137-1, page 54 of 74), attached to the Gillespie Affidavit. From January 30, 2010 to March 6, 2010, Mr. Calbart was housed in Building 6, with special management inmates. He was assigned a bottom bunk and a bottom tier cell. *See* Gillespie Affidavit, at ¶ 21.

Plaintiff was seen again by Dr. O'Brien on February 27, 2010, who noted that Mr. Calbart "walks fairly well." *See* Exhibit A-5 (doc. #137-1, page 55 of 74), attached to the Gillespie Affidavit. ). From March 6, 2010, to April 3, 2010, Mr. Calbart was housed in Building 9, with the general population. *See* Gillespie Affidavit, at ¶ 22. On March 13, 2010, Mr. Calbart reported to Dr. O'Brien that his knees were hurting but that he "[didn't] want to come to Medical." The same record noted that Mr. Calbart was walking with a limp. *See* Exhibit A-5 (doc. #137-1, page 56 of 74), attached to the Gillespie Affidavit. On April 3, 2010, Mr. Calbart

submitted an Inmate Request for Medical Assistance indicating that he "fell walking," was unable to bear weight on his leg, and needed crutches.  A nursing note dated April 6, 2010 states that Mr. Calbart did not want to return to the medical unit and that he wanted Vicodin administered four times per day rather than three times per day.  Mr. Calbart was encouraged to continue elevating his knee, and was scheduled to see the doctor at the weekly visit on April 13, 2010.  *See* Exhibit A-5 (doc. #137-1, page 57 of 74), attached to the Gillespie Affidavit. .

On April 3, 2010, Mr. Calbart was seen by the medical staff following an altercation. That same day he was medically cleared for general population housing.  *See* Exhibit A-5 (doc. #137-1, page 58 of 74), attached to the Gillespie Affidavit.  From April 3, 2010 to April 22, 2010, Mr. Calbart was housed in Building 6 where he was assigned a bottom tier cell and a bottom bunk.  *See* Gillespie Affidavit, at ¶ 23.

On April 13, 2010, Mr. Calbart was seen by Dr. O'Brien who noted his ongoing knee pain.  Dr. O'Brien prescribed a bottom bunk and bottom tier cell for Mr. Calbart.[5]  *See* Exhibit A-5 (doc. #137-1, page 59 of 74), attached to the Gillespie Affidavit.  From April 22, 2010, to May 2, 2010, Mr. Calbart was housed in Building 9, with the general population.  He was assigned a bottom bunk on the second floor.  *See* Gillespie Affidavit, at ¶ 24.  Since May 2, 2010,

---

[5]Not surprisingly, each side has construed Dr. O'Brien's April 13, 2010 medical entry in a self-serving manner.  Defendants interpret Dr. O'Brien's reference to "Bottom bunk/bottom tier" as simply a recommendation, rather than an order binding on Jail staff.  Mr. Calbart characterizes Dr. O'Brien's note as a "medical restriction" that had some mandatory effect on housing decisions.  I am not in a position to determine which, if either, interpretation is correct. This court simply notes that Dr. O'Brien's written entry appears under the "Problem/Plan" section of the April 13, 2010 Progress Note.

Plaintiff has been housed at the Denver Justice Center.[6]

B.      *Plaintiff's Claim under the Americans with Disabilities Act*

Mr. Calbart alleges in the Third Amended Complaint that he suffers from "cognizable disabilities" relating to the chronic, deteriorating condition of his knees.  Plaintiff contends that Defendant Wise was negligent in refusing to follow proper "medical guidelines" for his condition, and that he fell down the stairs on May 1, 2010 and "now suffer[s] injuries" because Defendant Wise refused "to make a reasonable accom[m]odation."  Plaintiff has brought a claim under the ADA against the Denver Sheriff Department and Deputy Sheriff Wise in his official capacity.[78]  Defendants contend that Plaintiff's ADA claim fails in the absence of evidence showing that he is a "qualified individual with a disability" as that term is defined by the statute, or that Defendants intentionally discriminated against Mr. Calbart.

---

[6]Mr. Calbart's Response proposes several "Undisputed Material Facts" involving medical-related events that occurred after May 1, 2010.  For example, Plaintiff notes that on June 28, 2010, he submitted a medical kite requesting a walker, that he was issued a wheelchair on August 3, 2010, and that he was issued crutches by Denver Health on October 10, 2010.  Mr. Calbart also claims that Denver Health recommended on October 11, 2010 that he receive a total knee replacement for both of his knees.  While the court acknowledges these factual representations, they are not material to Plaintiff's ADA and constitutional claims that hinge on conduct that occurred on or before May 1, 2010 and Plaintiff's assignment to Building 9B.  *Cf. Ayon v. Gourley*, 47 F. Supp. 2d at 1252 (evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment).

[7]"[C]laims under the ADA are only actionable against entities or individuals in their official capacities."  *Baze v. Huddleston*, 2012 WL 122566, at *4 (W.D. Ky. 2012).  *See also Herrerra v. Michigan Department of Corrections*, 2011 WL 3862640, at *17 (E.D. Mich. 2011) (holding that a "public entity" for purpose of the ADA does not include an individual prison official and, therefore, plaintiff was barred from bringing an ADA claim against defendant in their individual capacity).

[8] Copies of unpublished decisions cited are attached to this Recommendation.

14

Title II of the Americans with Disabilities Act states, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   *See* 42 U.S.C. § 12132.  "This provision extends to discrimination against inmates detained in a county jail."  *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citation omitted).  "To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability."  *Id.* at 1193. (citations omitted).  "A plaintiff asserting a private cause of action for violations of the ADA . . . may only recover compensatory damages upon a showing of intentional discrimination," *Delano-Pyle v. Victoria County*, 203 F.3d 567, 575 (5th Cir. 2002), and cannot sustain a claim based solely on isolated acts of negligence.  *Foley v. City of Lafayette*, 359 F.3d 925, 931 (7th Cir. 2004).

The Americans with Disabilities Act is intended to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and able-bodied."  *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).  A "qualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *See* 42 U.S.C. § 12131.

15

A disability within the meaning of the ADA is, *inter alia*, "'a physical or mental

impairment that substantially limits one or more of the major life activities' of an individual."

*Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d at 1193-94 (quoting  42 U.S.C. §

12102(2)(A)).  "Individuals attempting to prove disability status under this test may not merely

rely on evidence of a medical diagnosis of an impairment." *Id.*  "Instead, the ADA requires those

'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the

limitation [caused by their impairment] in terms of their own experience . . . is substantial.'"  *Id.*

at 1194 (internal quotation marks and citations omitted).  For purposes of the instant motion, I

will accept Plaintiff's representation that his arthritic knees caused pain and, over time, limited

his mobility.  This court will also presume, without deciding, that Mr. Calbart's chronic,

degenerative arthritis in both knees, qualifies as a disability under the ADA.[9]

Those findings, however, will not suffice to defeat Defendants' motion for summary

judgment.  Mr. Calbart also must come forward with evidence to show that because of his

disability, he was intentionally precluded from participating in services, programs or activities

offered to other non-disabled inmates or detainees  at the Denver County Jail.  *Cf. Herrerra v.*

*Michigan Department of Corrections*, 2011 WL 3862640, at *18 (E.D. Mich. 2011) (dismissing

plaintiffs' ADA claim based on their failure to allege they were being excluded from

participating in or had been denied the benefit of any prison program, services or activities

---

[9]Defendants argue that notwithstanding Plaintiff's medical diagnosis of chronic arthritis, Mr. Calbart has not come forward with evidence to show that he was "substantially limited in a major life activity because of his arthritis" during the period between April 13 and May 1, 2010. *See* Defendants' Reply to Response to Motion for Summary Judgment (doc. #158), at 7.  The court is not required to resolve that factual issue in view of Plaintiff's failure to establish all the elements of a *prima facie* claim under the ADA.

because of their disabilities); *Lucas v. Goergia Correctional Health Care*, 2006 WL 839359, at

*10-11 (S.D. Ga. 2006) (while conceding that plaintiff suffered from osteoarthritis in his knees,

denied plaintiff's ADA claim where there was no evidence that his mobility problems had

resulted in the actual denial of access to any program, service or activity at the correctional

facility); *Burgess v. Goord*, 1999 WL 33458, at *7 (S.D.N.Y. 1999) (holding that the plaintiff-

inmate's injuries to both knees and resulting impaired mobility, as well as his inaccessibility to a

cane or prison elevator, did not support a discrimination claim under the ADA). *See also*

*Cabassa v. Smith*, 2010 WL 786312, at *3 (N.D.N.Y. 2010) (holding that a "challenge to the

adequacy of medical care or health services is not a claim of 'illegal disability discrimination' as

contemplated" by the ADA).

      The record in this case is devoid of any evidence suggesting that Mr. Calbart suffered any

discrimination in accessing programs, activities or services offered to non-disabled inmates or

detainees in the Denver County Jail.  Distilled to its essence, Plaintiff's ADA claim contends that

Deputy Sheriff Wise, and by extension the Denver Sheriff's Department, was remiss in not

providing Mr. Calbart with a lower bunk/ground floor cell assignment as contemplated by Dr.

O'Brien.  In short, Defendant Wise is alleged to have interfered with a treatment regime

prescribed by Plaintiff's physician.  That does not constitute discrimination proscribed by the

ADA.  *Cf. Jones v. Smith*, 109 F. App'x 304, 309 (10th Cir. 2004) (holding that while the

plaintiff-inmate's work assignment may have been the product of incompetence or personal spite

on the part of the defendant, an ADA claim could not survive where the plaintiff did not claim

that his assignment to medically inappropriate work was done *because of his disability*); *Rashad*

*v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001) ("[t]he failure to provide medical treatment to a

disabled prisoner, while raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation"); *Redding v. Hanlon*, 2008 WL 762078, at *16 (D. Minn. 2008) (dismissed the inmate's ADA claim where the plaintiff alleged that the defendants had denied him the single cell accommodation ordered by his doctor, not that he had been denied access to any service or program).

Without evidence of intentional discrimination based upon his disability, Mr. Calbart cannot prevail at trial. Based upon Mr. Calbart's failure to come forward with evidence to support each element of his ADA claim, I conclude that Plaintiff has not established a genuine issue of material fact that would defeat Defendants' Motion for Summary Judgment. *Cf. Chipman v. White*, 2011 WL 4949798, at *7 (D. Colo. 2011) (granting defendants' motion for summary judgment as to the plaintiff -inmate's ADA claim based upon the plaintiff's failure to come forward with evidence to establish a *prima facie* case). Accordingly, I will recommend dismissal of Mr. Calbart's claim under the Americans With Disabilities Act.

C.   *Plaintiff's Fourteenth Amendment Claim*

Title 42 U.S.C. § 1983 provides a civil cause of action for individuals who are deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by a person acting "under color of law." *Adickes v. SH Kress & Co.*, 398 U.S. 144, 147, 150 (1970). Section 1983 does not create any substantive rights; rather, it creates only a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-18 (1979).

If Mr. Calbart was classified as a pretrial detainee in April and May of 2010, he may

assert a claim under the Fourteenth Amendment based upon an alleged violation of his due process rights.  Alternatively, as a post-conviction prisoner, Mr. Calbart enjoys Eighth Amendment protections against unconstitutional conditions of confinement.  Regardless of Mr. Calbart's classification, the court's analysis is the same under the Fourteenth and Eighth Amendments.  *Cf. Bass v. Pottawatomie County Public Safety Center,* 425 F. App'x 713, 719 (10th Cir. 2011).

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).  Certain conditions of confinement, if they inflict pain unnecessarily and wantonly, may constitute cruel and unusual punishment under the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  *See also Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) ("Prison officials are required to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety.").

A claim brought under the Eighth Amendment has both an objective component, *i.e.,* whether the deprivation of a basic human need is sufficiently serious, and a subjective component, *i.e.,* whether the defendant-official acted with a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  As for the objective component,

19

> extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations omitted). Thus, in a case challenging conditions of confinement, a "sufficiently serious" deprivation is shown when "a prison official's act or omission . . . result[s] in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. at 834. The "deliberate indifference" subjective standard applies to claims of inhumane conditions of confinement. *Wilson v. Seiter*, 501 U.S. at 303-04. A finding of deliberate indifference requires a showing that the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. at 837. Under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

As noted previously, this court will presume that Mr. Calbart presented a serious medical condition on April 13, 2010 when Dr. O'Brien prescribed a lower cell and lower bunk. However, Mr. Calbart has not demonstrated that his assignment to Building 9 and a second floor cell deprived him of "the minimal civilized measure of life's necessities," as required by the objective prong of the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. at 298 (citing *Rhodes*, 452 U.S. at 347). Mr. Calbart does not point to any specific deprivation attributable to his cell assignment on the second floor of Building 9 that objectively would rise to the level of "cruel and

20

unusual punishment."

Mr. Calbart also fails to come forward with sufficient facts to establish a triable issue as to the subjective component of the Eighth Amendment test.  The record makes clear that Plaintiff was seen by medical staff on several occasions for his arthritic knees.  Given the factual record, the court cannot conclude that medical personnel in the County Jail were oblivious or deliberately indifferent to Mr. Calbart's chronic medical condition.  *Cf. Albritton v. Quarterman*, 2009 WL 585659, at *7 (E.D. Tex. 2009) (noting that "medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs").  The fact that Mr. Calbart fell while negotiating the stairs in Building 9 does not, without more, demonstrate that Defendants were deliberately indifferent to his medical condition.  *Cf. Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) (noting that "[a] 'slip and fall,' without more, does not amount to cruel and unusual punishment . . . .").  In *Reynolds,* the Tenth Circuit declined to find an Eighth Amendment violation where the plaintiff-inmate slipped on standing water, notwithstanding the fact that the plaintiff was on crutches and had specifically warned the defendants that he was at a greater risk of falling.  The appellate court in *Reynolds* also observed that the plaintiff had safely entered and exited the same area on several occasions prior to his fall.  Similarly, in this case, it appears that Mr. Calbart had been residing on the second floor of Building 9 for approximately nine days before he fell on the stairs.

Mr. Calbart also has not rebutted the affidavit provided by Defendant Wise.  Plaintiff contends that he informed Deputy Sheriff Wise of his housing designation to a lower cell/lower bunk.  While Defendant Wise cannot recall whether he personally assigned Mr. Calbart to

Building 9B on April 22, 2010, his affidavit indicates that "[t]he usual practice for an inmate with alerts concerning housing assignment is to re-assign the inmate to the recommended housing, such as a bottom tier and a bottom bunk, if the space is available in that building of the jail."

> With a situation such as Mr. Calbart's, where he has been re-classified from Building 6 special management to Building 9 general population with a housing recommendation for a bottom tier and a bottom bunk, but the space was not available in Building 9, I would have followed the usual practice of offering Mr. Calbart the choice of remaining in Building 6 with a bottom tier and a bottom bunk, or moving to Building 9 with a bottom bunk on the second tier, if no bottom bunk floor cell was available.

See Wise Affidavit, at ¶¶ 6 and 7.

Although Mr. Calbart expresses some skepticism at Deputy Sheriff Wise's professed lack of recall, he has not come forward with any evidence that would contradict the Deputy Sheriff's description of his standard practices or his explanation for Plaintiff's second-floor housing assignment on April 22, 2010.[10]   Cf. Farmer v. Brennen, 511 U.S. at 838 (holding that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," will not sustain a claim under the Eighth Amendment).

At best, Mr. Calbart suggests that County Jail personnel were negligent in assigning him to a second floor cell.  Such an allegation is insufficient to state claim under the Eighth Amendment.  In the absence of evidence that would satisfy both the objective and subjective prongs of an Eighth Amendment claim, I must conclude that Mr. Calbart has failed to present a

---

[10]Evidence presented by the parties indicates that prior to April 22, 2010, Mr. Calbert occasionally had been assigned to Building 9A.  If the court is correct in assuming that the "9A" designation refers to a first floor cell tier in Building 9, it would appear that Jail staff had made an effort in the past to give Mr. Calbert a lower tier assignment when space was available.  Those past cell assignments would seem to lend some credibility to Defendant Wise's version of events.

colorable claim under 42 U.S.C. § 1983.

D.      *Qualified Immunity*

To the extent that Mr. Calbart is suing Deputy Sheriff Wise in his individual capacity,

Defendant has raised the defense of qualified immunity. "The doctrine of qualified immunity

provides that [w]hen government officials are performing discretionary functions, they will not

be held liable for their conduct unless their actions violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Mitchell v. Maynard*, 80

F.3d 1433, 1447 (10th Cir. 1996) (internal quotation marks and citations omitted). *See also*

*Wilson v. Layne*, 526 U.S. 603, 609 (1999) (a court evaluating a claim of qualified immunity

"must first determine whether the plaintiff has alleged the deprivation of an actual constitutional

right at all, and if so, proceed to determine whether that right was clearly established at the time

of the alleged violation.").

Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v.*

*Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

> Resolution of a dispositive motion based on qualified immunity involves a two-
> pronged inquiry. First, a court must decide whether the facts that a plaintiff has
> alleged or shown make out a violation of a constitutional right. Second, . . . the
> court must decide whether the right at issue was clearly established at the time of
> the defendant's alleged misconduct.

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal citations omitted)

"A reviewing court may exercise [its] sound discretion in deciding which the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." *Id.* "Qualified immunity is applicable unless" the plaintiff can satisfy

both prongs of the inquiry.  *Id.*

In light of  Mr. Calbart's failure to present a viable claim under the Fourteenth or Eighth Amendments, Defendant Wise in his individual capacity is entitled to qualified immunity.  *See Wilder v. Turner*, 490 F.3d at 815 (on remand, instructing the district court to enter judgment in favor of defendant on the basis of qualified immunity, where the plaintiff failed to carry his burden to show violation of a constitutional right).

E.      *Plaintiff's Duty to Exhaust Administrative Remedies*

In moving for summary judgment, Defendants contend that Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  Defendants argue that "Mr. Calbart never submitted a grievance which requested a remedy of being assigned to a bottom tier cell in Building 9" and, therefore, his claims under the ADA and Eighth Amendment must be dismissed.  While the issue of exhaustion is moot, as a practical matter, given the court's recommendations relative to Plaintiff's substantive claims for relief, some discussion regarding Defendants' exhaustion challenge may be helpful should the district court reach a different result.

The Prison Litigation Reform Act specifically states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  *See* 42 U.S.C. § 1997e(a).  This "exhaustion requirement is designed to afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Johnson v. Testman*, 380

24

F.3d 691, 697 (2d Cir. 2004) ("a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought") (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). *See also Kikumura v. Osagie*, 461 F.3d 1269, 1283 (10th Cir. 2006) ("inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures") (quoting *Johnson v. Testman*, 380 F.3d at 697).

It is well-established that "exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). The PLRA requires "proper exhaustion" of administrative remedies, which means the plaintiff must utilize all administrative remedies provided and must comply with the deadlines and other procedural rules prior to filing a federal lawsuit relating to the conditions of his confinement. *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). *See also Jones v. Bock*, 549 U.S. at 218 ("to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules, – rules that are defined not by the PLRA, but by the prison grievance process itself") (internal quotation marks and citation omitted). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones v. Bock*, 549 U.S. at 218. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

In this case, the court must determine whether Mr. Calbart met his obligations under the PLRA by providing jail authorities with enough information to take appropriate responsive measures and by fully exhausting his administrative remedies. Unless the court can resolve each

of these issues in Mr. Calbart's favor, this action must fail.

In 2010, the Inmate Handbook provided to all inmates in the Denver County Jail mandated a multi-step grievance procedure. The first step of the grievance procedure requires the inmate to deliver a completed written grievance to a supervisor. The grievance should be addressed to the Operations Major, and must include the following information: the date and time of the incident; a "specific statement detailing the act or condition giving rise to the grievance;" a "specific remedy for the grievance;" and the inmate's signature, housing location and book-in number. The inmate must file his grievance within ten calendar days of the incident in which the inmate was aggrieved. The Operations Major is expected to provide a written dated response within ten working days of receipt of the grievance. Step two of the grievance procedure requires the inmate to write a sealed letter to the Division Chief stating the specific grievance and all previous steps the inmate has taken, including all previous answers received. The Division Chief should provide a written dated response within ten working days of receipt of the appeal. Thereafter, if the inmate is still aggrieved, the inmate must write a personal letter to the Director of Corrections. "The Director will make the final resolution and will provide a written, dated response within 10 working days of receipt of the appeal." *See* Exhibit A-6 (doc. #137-1, pages 61-64 of 74), attached to the Gillespie Affidavit.

Where an inmate's concerns relate to medical issues or medical treatment, grievance procedures for the County Jail require the inmate to send a written request or grievance form to the Nursing Supervisor. That written grievance must indicate the time and date of the incident alleged, provide a "specific statement detailing the act or condition giving rise to the grievance," request a specific remedy for the grievance, and include the inmate's signature, housing location

and book-in number.  If the inmate is still not satisfied with the response received from the

Nursing Supervisor, he may send a sealed letter to the Patient Advocate at Denver Health Center.

*Id.*

Defendants assert that Mr. Calbart submitted three grievances between April 13, 2010,

when Dr. O'Brien prescribed a bottom bunk and bottom tier cell, and May 1, 2010, when he

allegedly fell.  Inmate Grievance Form No. 09-22291, dated April 25, 2010, complained about

needing a No Salt Diet Card.  Mr. Calbart specifically asked that the "Medical Board review

Denver County Jail Policy on no salt diet for inmate who receive them from a Doctor."  *See*

Exhibit A-7 (doc. #137-1, at pages 66-67 of 74), attached to the Gillespie Affidavit.  Grievance

No. 09-22292, also dated April 25, 2010, complained about the lack of a prompt medical

response to Mr. Calbart's symptoms of chest pain and difficulty breathing.  *See* Exhibit A-8 (doc.

#137-1, at pages 67-68 of 74), attached to the Gillespie Affidavit.  A third grievance submitted

on April 25, 2010, No. 09-22293, complained about the time of day when Plaintiff's prescription

medicine was administered.  In this grievance, Mr. Calbart asked Jail staff to "let Doctor O'Brien

know that my time was change not my (sic) medical but Sheriff."  *See* Exhibit A-9 (doc. #137-1,

at pages 69-70 of 74), attached to the Gillespie Affidavit .  None of these grievances addressed

Mr. Calbart's post-April 13, 2010 cell/bunk assignment.

Mr. Calbart submitted an Inmate Grievance Form, No. 09-22284, on May 1, 2010, the

date of his alleged fall in Building 9.  In this grievance, Mr. Calbart wrote

> I came out of 6A on 4-23-2010 and told Classification that I have a bottom tier
> and bottom bunk Medical Restrictions.  I told Sheriff Wise and Burke and medical
> staff and they never move me.  I fell going down the stair.  I told Medical Staff
> Nurse and she said it not her problems.  She has a case (sic) on her foot short hair
> and now I'm in serve (sic) pain in both knees.  I wrote a medical kite to see Dr.

O'Brien.

As for a specific remedy, the May 1, 2010 grievance merely asked "if Dr. O'Brien knows about my fall."  Grievance N. 09-22284 did not request a building, cell or bunk re-assignment.  It appears that Grievance No. 09-22284 was assigned to the Nursing Supervisor for follow-up.  *See* Exhibit A-10 (doc. #137-1, at page 71 of 74), attached to the Gillespie Affidavit.

On June 2, 2010, Mr. Calbart received a response to Grievance No. 09-22284 from Nurse Jesus Ramos, who apparently was assigned to the Denver County Jail Medical Unit.  Nurse Ramos indicated that additional information would be helpful in investigating Mr. Calbart's complaint, including "the name of the nurse that you stated you informed of the claimed fall so that we could do follow up."[11]  Nurse Ramos also told Mr. Calbart that "any issues concerning deputy sheriff staff needs to be addressed with their supervisor."  *See* Exhibit A-10 (doc. #137-1, at page 72 of 74), attached to the Gillespie Affidavit.

Plaintiff submitted a supplemental grievance form on June 16, 2010, in which he identified the nurse to whom he complained after his fall on May 1, 2010.  Mr. Calbart asked as a specific remedy that someone "Do Follow-up on my complaint Form no. 09-22289."  Again, this grievance was forwarded to the Nursing Supervisor.  *See* Exhibit A-10 (doc. #137-1, at page 73 of 74), attached to the Gillespie Affidavit.  Nurse Ramos responded to Mr. Calbart on July 9, 2010.  In this response, Nurse Ramos indicated that Mr. Calbart's medical record was reviewed, but "there is a considerable amount of pertinent information missing" regarding where or when Mr. Calbart made his initial complaint to medical staff following the May 1, 2010 fall.  Nurse

---

[11]From this comment, it would appear that Nurse Ramos construed Grievance No. 09-22284 as complaining about a lack of medical attention for injuries that Mr. Calbart sustained in his fall, rather than an inappropriate cell assignment.

Ramos noted "[t]here is no recorded encounter on 05-01-2010 of a claimed fall." *See* Exhibit A-10 (doc. #137-1, at page 74 of 74), attached to the Gillespie Affidavit.

Mr. Calbart has provided additional documentation describing his efforts to exhaust administrative grievance procedures following the May 1, 2010 incident. It appears that on June 1, 2010, Mr. Calbart wrote to the "Division Chief" complaining that he had not received a response to Grievance No. 09-22284. Plaintiff advised the Division Chief that he "fell down the stair on 5-1-2010," that he has a "Medical Restriction Bottom Tier, Bottom Bunk," and that "Sheriff Wise assign (sic) me to 9B 2nd Floor, 2 Flights of Stair." *See* Plaintiff's Response (doc. #147), at page 17 of 43. Mr. Calbart wrote to "Director Lovinger" on June 23. 2010. In this communication, Mr. Calbart complained that he

> wrote to Sheriff level and to a Division Chief about being housed on the 2d Floor by Sheriff Wise on 4-23-10. I have a Medical Restriction Bottom Tier Bottom Bunk. I fell down the stairs on 5-1-2010 injury (sic.) myself.

*Id.* at 18 of 43. It also appears that Mr. Calbert submitted a "step 2" medical grievance on July 21, 2010 in response to Nurse Ramos's communication on June 16, 2010. In his medical grievance appeal, Mr. Calbert specifically identified the medical personnel he spoke with on May 1, 2010 and explained that on that same day he gave a medical kite to Deputy Sheriff Ortego. Mr. Calbert's appeal specifically requests that authorities "please found (sic) the medical kite on 5-1-2010 about my fall down stairs in Blg 9B." *Id.* at 23 of 43.

Based upon the totality of the evidence presented, I conclude that Mr. Calbart filed his initial grievance on May 1, 2010, which was within ten days of his re-assignment from Building 6A to Building 9B. Although Grievance No. 09-22284 mentions the fall that occurred on May 1, 2010, the aggrieved conduct appears to be the failure of Defendant Wise and Jail "medical staff"

to move Mr. Calbart to a lower cell/lower bunk after they were made aware of his post-April 13, 2010 classification status.  Mr. Calbart apparently wanted this omission to be brought to the attention of his prescribing physician, Dr. O'Brien.  Once Grievance No. 09-22284 was submitted, however, the administrative process becomes rather murky.

There is some evidence that would suggest that on May 1, 2010, Mr. Calbert intended to pursue  a "medical" grievance.[12]  It is clear that Mr. Calbart submitted a "Med Step 2" grievance form on July 21, 2010 that was again referred to Nurse Ramos.  If this assumption is correct, there is no evidence before the court to indicate Plaintiff exhausted his administrative remedies by sending a sealed letter to the Patient Advocate at Denver Health.

If it was not Mr. Calbart's intention to submit a medical grievance, then he was obligated to complete the three-step process set forth in the Inmate Handbook.  Nothing on Grievance No. 09-22284 expressly identified cell/bunk re-assignment as the specific remedy sought.  Neither side has provided the court with evidence indicating that the Operations Major ever saw Mr. Calbart's May 1, 2010 grievance or sent Mr. Calbart a written response.  Plaintiff sent a letter to the Division Chief on June 1, 2010, followed by a letter to Director Lovinger on June 23, 2010. However, it is not clear whether these letters were construed as step-2 and step-3 appeals under the non-medical grievance procedure, or were viewed by Jail managers as an expression of Mr. Calbart's dissatisfaction with the handling of his medical grievance.

On a Rule 56 motion, the court is required to construe the factual record and draw all

---

[12]However, the court notes that the three grievances Mr. Calbart submitted on April 25, 2010 all clearly related to medical issues and all had the same hand-written notation "Medical" at the top of the Inmate Grievance Form.  Mr. Calbart did not include that "Medical" notation on Grievance No. 09-22284.

reasonable inferences therefrom in light most favorable to the non-moving party.  Based on the record currently available to the court, I conclude there are simply too many unresolved factual questions to sustain Defendants' challenge under the PLRA.

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that Defendants' Motion for Summary Judgment (doc. #137) be GRANTED and that Judgment on the Third Amended Complaint (doc. # 25) be granted in favor of Defendants Denver Sheriff Department and Wise, and against Plaintiff.   This court further RECOMMENDS that Defendant Burke be dismissed from this action, without prejudice, pursuant to Fed. R. Civ. P. 4(m).


**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the

right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir.

1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite

the lack of an objection does not preclude application of the "firm waiver rule"); *International*

*Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th

Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant

had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d

1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to

appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122

(10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 23rd day of February, 2012.

BY THE COURT:

s/Craig B. Shaffer
United States Magistrate Judge